Your Honor, this is the second case of the morning. Call 212-426 Kempel v. ETX Transmissions. On behalf of the Appellant, Mr. Robert Trezina. On behalf of the Appellee, Mr. Anthony L.E. Sousa. All right, is it Trezina or Trezna? It's Trezna. Trezna, okay. Mr. Trezna, you may proceed. May it please the Court, my name is Robert Trezna. I represent the Appellant, Prosepelle Richard Kempel and Chicago Title and Trust Company. This appeal, from our perspective, is a fairly simple one. It turns on one central question. That's basically a matter of documentary evidence. Whether the email from October 2 of 2009 from Mr. Kempel to Alan Gatlin v. ETX constitutes a lockout or some sort of constructive eviction. We contend that it does not. And we contend that it cannot. Illinois law is clear on the point that mere words, other than under extreme circumstances, do not constitute a lockout or constructive eviction. Words must be combined with some sort of overt act. And that's why the documentary evidence is why you're proposing that this is the no-vote review after trial? That's correct, Your Honor. As we argued in our brief, there's no real dispute on any of the central factual issues. There's admission that the email was sent. There's an admission that prior to the email being sent, ETX had already packed up all of its business equipment, machinery, inventory, and had given a warn notice that it was, at some point in time, going to be leaving. Your Honor, was it? Oh, Mr. Raymond? Yes, sir. That's right. Justice Spence. I'm sorry, you may proceed. Thank you. That they were already planning since about June or July of 2009 to vacate those premises. They, however, did not give any type of notice or solicit any type of agreement from the landlord to leave the premises in some sort of negotiated fashion. In fact, the record shows that they, in fact, did not respond to Mrs. Kumpel's inquiries about whether they were leaving. And they even did testify, as was indicated in the report of proceedings, that they had some inquiries to Mrs. Kumpel about retaining the premises for other purposes, or alternatively, to sublease the premises, which they had a right to do for that last term. So there was no indication given by them that even though they may have been abandoning the premises for purposes of operating the business that they had been operating from there, that they were actually handing back the business, or in any other way, walking away from the actual obligations under the lease. How did Judge Hall come to the conclusion that this was constructive eviction? Your Honor, I wish I knew. He really, if you look at the record, he really did not articulate it. In fact, if you go through his findings, one almost views that finding in favor of ETX to be anomalous, given all the other factual findings, such as that the parties fully performed their obligations prior to October 2 of 2009. There were a bunch of issues, as the Court is aware, of some sort of tension between the landlord and the tenant. But all of that occurred at the very beginning of the lease in 2007. And even that wasn't found by Judge Hall to be in any way, shape, or form some type of constructive eviction, or interference with the ETX's ability to apply for the joint lease. Did the lease provide for a specific type of notice, either in writing, registered mail, certified mail? Actually, the lease does have a provision that any notice of any type given by one party to the other has to be in writing and sent by mail, or by personal delivery. There is nothing in the lease that allows for any type of lawful notice to be given by email. It's not one of the prescribed forms. However, obviously in this case, the ETX took that email as some type of notice, and also viewed that as some type of termination of the lease, even though there's no provision in the lease that would acknowledge that as a proper form of termination. There was, as I said, no lockout of any type. There was no overt action. In fact, it was a few weeks later that ETX turned back the keys to the premises, and that actually gave the landlord for the first time access to the premises, which they then took. Around that same time, they filed a suit, this action, for forcible entry and also for rent. So they attempted at that point to pursue their remedies. Why did they take the keys back if they wanted to pursue rent? Why did they divest the people of possession of the property and then sue for rent coming up? Well, I don't think they divested the access to the premises from ETX. ETX voluntarily returned those keys. Well, remember that. I mean, if we were just looking at the 10-2 email, then maybe I think maybe your argument about the standard of review may have more merit. Well, we're talking about all these things that happened after that. We had the 10-2 email. Then we have the 10-5 letter. And in the 10-5 letter, it should have been clear to your clients based upon that letter that the other side was thinking, this is a lockout. I am being locked out now. And then your client never responds. And then 10 days later, they come in and say, well, since we're being locked out, here are the keys. Your client takes the keys and then enters the premises and starts cleaning up. I'm not sure that the record shows that the keys were returned 15 days after the first or somewhere around the 15th. I think it's a little unclear of exactly how soon after. I think the testimony or the bystander's report of proceedings would reflect that it was a few weeks after. And it actually seemed apparently or could have coincided with the filing of the suit. The fact here is that there is no obligation for my client to respond to that letter that was sent a few days after the email. My client did not take any action to lock down the premises or deprive them of possession, which is why they had retained the keys. They had every right to go back in there. And in response effectively to that letter, Mr. Kumpel filed the lawsuit seeking possession because he clearly acknowledged in that suit that he didn't have possession. He was seeking a forcible entry to be able to acquire possession, also seeking rent under the second count of the complaint. So there was never any acknowledgement or any kind of agreement or even any sort of acquiescence in the characterization that ETX seemed to employ. And even their characterization seems to be inconsistent with their view that they still had opportunities to deal with the property for that remaining year, either through alternative uses or through subleasing. And I think that's a crucial point. Did that conversation take place before or after the keys were returned? Oh, that conversation took place, I believe the record reflects it, in June or July. That was when Mrs. Kumpel was inquiring after they had heard about the warrant notice being sent and the premises being slowly having all the equipment and things removed from the premises. So that was their attempt to kind of ascertain ETX's intentions. And in each instance, Mr. Gatlin or someone from ETX was informing them, we still have designs on the property. Interestingly enough, too, that if they were being deprived, if ETX was being deprived of the property contrary to their own intentions, they had the opportunity to go into court and attempt to enforce their rights to stay in the premises. They'll obtain a declaratory judgment or to sue to enjoin the deprivation of the property. They did not. So in effect, they abandoned the property, but they did not take any action to assert their tenancy or to remedy the situation through damages or through a sublease that indicated they were intending to do. Did the defendant ever pay October's rent? The defendant never paid any rent after September, did not pay October or any other rent. And when the defendant sent the letter, was the rent payment overdue? The rent payment, Judge Hall found that the rent payment was due on October 1st and therefore it would have been overdue because I don't believe the letter was sent until I think the 5th of October. There was a five-day grace period, isn't there? There was not a five-day grace period. There was an indication in the record that from time to time ETX would pay the rent later than the first day. And apparently in each instance that that occurred without any specific number of occurrences, the landlord acquiesced in that delayed payment. Well, the five-day grace period I'm referring to is wasn't there a provision in the lease that if they didn't pay the rent, your client would have to send them written notice and they had five days to cure the defect? That's in the case where the client is attempting to enforce, is attempting to remove them from the premises for nonpayment. I think that would have been basically a precursor to a forcible entry action. Here it doesn't really apply because there's no dispute that by the time they sent that letter out on the 5th, I think, of October, the ETX had already removed itself from the premises. Couldn't you take the 10-2 email as that letter saying we're throwing you out if you don't, with the wording of something like based upon the games you're playing with the rent? That's exactly the wording, Your Honor, but it still doesn't satisfy the lease requirements, nor does it actually satisfy any requirements of Illinois law regarding forcible entry and retainer. It was simply a stupid, silly act that had no legal consequences whatsoever and shouldn't be invested in with any legal consequences at this point. But it did threaten, I mean, you agree it threatened a lock-up. It made a future threat of a lock-up. I believe threat may be a little strong. It's simply advised of the possibility of a lock-out, right? A threat has a connotation of some sort of dark or sinister element. It's simply saying you've been playing games with this situation. If you don't pay up, we will be locking you out. No set time, no other indication of that, it would definitely occur. It was basically almost, in this case, an idle threat. And then the letter comes in saying, I view your letter as a termination of this lease, basically. And your client doesn't feel the need, there's no duty at all to set the record straight, and then when the keys are returned, no duty to say, here, you keep the keys, I still want to get my rent. Well, number one, since they already moved out, my client, in order to mitigate damages, needed to have access to the premises. The simplest and most economic way to do so was to accept the keys, therefore he didn't have to change the locks and could then start to mitigate damages by showing the property, listing the property, all of the things that it did, cleaning up the property. So that was consistent with its duties to mitigate. As far as objecting to the letter, I don't believe that there is any requirement, legal requirement, that an objection to an assertion of rights inconsistent with your own has to be objected to and has to be objected to within a finite period of time. We would contend that when they filed the lawsuit a few weeks later, that was their answer, that they didn't have to respond immediately to an assertion of rights that they arguably didn't, or most certainly didn't agree with. So from that... So the future lockout was nonspecific as to any date or time, right? Exactly. All right. Now, if you factor in the concern that they had for the safety of their employees, does that change anything? That was a false concern because, as Judge Hall found, and correctly, because the record doesn't indicate anything further, the concern for the safety occurred back in the very beginning of the lease term in 2007. In the first few months, there were some altercations, verbal altercations, between Mrs. Kumpel and some folks employed by ETX. In fact, ETX actually got a security service in there for a short period of time. When was that? When was the security? In the first few months of the lease term in 2007. So that would have been two years. Two years prior. And in fact, I think the record would show that the actual lease in issue here wasn't signed when it was signed. It was signed when the security forces were already in place. So even though ETX had security personnel on site, they still went ahead and signed this three-year lease because they only had initially a one-year lease. So, as Judge Hall found, there was no breach of the lease by either side prior to October 1 of 2009. And the incidents that occurred early on had apparently been overlooked or waived or forfeited. They did not have any material influence on the decision that was made by ETX to walk away from their obligations under the lease. Now, the Perry case talks about a voluntary surrender after the threat of a future lockout is not a constructive eviction. That's correct. Okay, but it also talks about, I mean, you can read that to say that a voluntary surrender after a threat of a future eviction or a future lockout would relieve the person from paying future rent. Oh, no, I think that's, obviously we would not read it that way. I think what that basically does is it takes the decision from that Wisconsin case. And basically in the Wisconsin case, I think it was a farm tenant told the landlord he's leaving. And he expected that he would have no further obligations, and the landlord kind of basically said, okay, fine. And at that point, that court determined that that was sufficient to relieve the tenant of further obligations. In this case, we don't have that situation. We don't have a voluntary turning of the property over to the landlord. ETX, in fact, had indicated they intended to stay in the premises either in a different capacity or to sublease. So they were not disclaiming the contract. They were not forfeiting their obligations or, more importantly, forfeiting their rights under the contract. Up until the time when that notice went out, they made no effort to negotiate a termination of the lease or to even indicate with any certainty that they were not going to go ahead with the remaining one year of the term. It was only after that, after the unfortunate e-mail from Mr. Koppel, that they apparently seized on that as a device for them to now walk away from the obligation. Up to that October 2nd e-mail, every indication had been that they would continue on, correct? I think that's not exactly right, Your Honor. Obviously, the concern that the couples had was they're hearing that all of the equipment's being moved out, the inventory's being moved out, there's a warrant notice being sent. They have a legitimate concern that these folks are packing up and leaving. On the other hand, when they inquired of ETX, Mr. Gaffney said, we don't know what we're going to do yet. We're moving our operations, but we may continue to use these premises for some other purpose. Or alternative, we have a right to sublease them under the lease, which they did. So at that point, up until the October 2nd e-mail, there was no doubt that they were going to assert their right to stay in the premises. Only after that e-mail did they then, as I say, seize on that as a device for them to walk away from the lease. Could they assert their right to remain on premises if they stopped paying rent? I'm sorry, Your Honor? Could they continue to assert their right to remain on premises or sublease it if they didn't pay their rent? They could, but then the operation of the lease provisions and Illinois law would kick into effect. They could have been served with a five-day notice, and the landlord could have forcibly evicted them should that have occurred. But that didn't happen. Gatlin's comments that you rely upon fly in the face of your abandonment argument. You're saying they abandoned it. You're arguing both sides of it. You're saying they abandoned it long before October 2, and that they indicated they weren't abandoning. They were moving things out, but they weren't abandoning. And then what I'm getting at is that at the very least, this abandonment argument is a manifest way. We have to give the court deferential, you know, deference on that finding. Well, actually, no, because I think what we're missing here is a timeline. There was no abandonment prior to the October 2, 2009 e-mail. Again, up until that point in time, even though ETX was removing its equipment and its inventory and everything else, they were still asserting to the landlord that they were either going to use the premises for some alternative use compared to what they had been using it for, or they could sublease it. That was the status quo as of October 2 of 2009. The e-mail is sent, and then five days later, ETX says, we treat this as a termination of the lease, and we're gone. Only after that occurred was there effectively an abandonment, at least from the standpoint of how ETX viewed its interest and future right to the premises, and that was then followed up with the voluntary tender by ETX of the keys somewhere a couple weeks or so afterwards. So it was really a sequential issue. There was no abandonment or no manifestation of any abandonment prior to the e-mail on October 2. Great, Counselor, we'll have time for a little argument. Thank you. Thank you. I'm going to try and say this name. I apologize. Mr. L.A. Sousa? L.A. Sousa. L.A. Sousa. Thank you. You may proceed. Good morning, Your Honors. May it please the Court. The trial court weighed and evaluated the testimony and evidence during the one-week bench trial and reached a correct result in this case. Judgment in favor of my client should be affirmed for at least two reasons. First, sort of picking up on the questions, this really was a classic case of voluntary surrender, and really that term to me is just a recognition of a basic principle of contract law. Parties, of course, can agree to end a contract. They can agree to terminate a lease early, and that's what happened here. The evidence was really undisputed that, sure, ETX had shut down its operations, but ETX told the landlord, they told plaintiffs that they had several alternative options that they were going to use the property for. They were considering their options. They continued to pay rent in June, July, August, September, and the only evidence in the record was that they would have paid rent in October, but for receiving the October 2nd lockout notice from the plaintiffs. That changed the party's relationship. And one of the critical factors here is that there was significant testimony and evidence regarding the party's rocky relationship and regarding the temperament and, frankly, the improper and inappropriate behavior of the plaintiffs, Mr. Richard Kumpel and Mrs. Deanna Kumpel. These individuals engaged in threatening behavior towards ETX's employees. They engaged in threatening behavior towards suppliers of ETX, and they engaged in other acts that are within the record that are just, you know, they're just inappropriate behavior that colored this entire relationship. I mean, that is critically a factual question that colored all of the trial court's findings in this case. But certainly, based on the evidence presented, what happened was that ETX was continuing to perform its obligations. It receives a threatening lockout email, especially coming from the source. Well, what if the landlord had said, as of October 2nd, the rent is now due. If you pay me within five days or ten days, it doesn't make any difference. I'm not going to accept it, and there is no grace period in the lease. What would the implications be for that statement? Well, I think the lease had a mechanism when rent is not paid. They would have sent a five-day notice, and we would have had a five-day period to cure and pay the rent. Now, the parties effectively waived that throughout their course of dealings. The testimony from Mr. Kumpel is that ETX routinely paid. So would the five-day notice be via email, or would it have to be in writing in mail? I think it could take any format. You know, the parties engaged in a casual format. Under the lease, technically speaking, I think it did have to come in the form of a mail letter. You know, and this is just speculation, but if ETX would have paid, I mean, they intended to pay. The only evidence was that they were planning on paying. Well, were you the one that wrote the letter? I was not. My partner, Bob Richards, wrote the letter. Why didn't he send an email? Well, because we're lawyers, and we tend to be more formal, I guess, and we wanted to certainly honor the letter of the lease. But that doesn't mean that we can't. I mean, you have to look at it from our perspective. We're continuing to pay our obligations. We received this threatening email saying we're going to lock down the building. So we go to them. I mean, we take the reasonable position here. We send them a letter saying, hey, we received your email. We understand that to mean that you're locking us out of the building, that we're now not allowed to access the building, that you view the lease as terminated. Okay, well, we're going to view the lease as terminated too. We're going to tender possession to you. We're going to discontinue our rent payments. He had weeks to reconsider that position, say, no, no, no, that's not what I meant. He testified. He understood that was our position. Didn't he have years? Well, I apologize. Didn't he have years if it was in writing, a 10-year statute of limitations for a breach of a contract? Well, certainly, but he could have. He had the opportunity without accepting possession. I mean, he chose to accept possession from us when we tendered it. Did the letter say if you don't respond, it will be deemed to be a plea of either null and contendory or guilt? It did not, Your Honor. Judicial admission? It did not, Your Honor. It was really just us saying we understand your intention, based on your email with me, that you're terminating the lease, that you want us out of the building. Do you remember the phrase, if this weren't a size day, I'd run you through? I'm not familiar with that expression. It's a counterfactual statement that, but for the fact that it was, in fact, a size day, the person who the statement was directed at was not placed in imminent danger, and therefore it was deemed not to be an assault. So why is this email not like that to the extent that, as Justice Spence said, there was no date given for when this lockout would take place or how it was going to be effected? So, you know, how are you placed in imminent danger of a lockout when the statement is nothing more than you're going to be locked out? Well, I think that statement, that email on its face is one thing, but it's a factual question based on the entire history of the relationship of these parties, how that was intended to be received by my client and how my client actually received it as a factual matter. And I think on that issue, the trial court heard abundant testimony regarding sort of the relationship of the parties and the issues they had, and so certainly it was a reasonable conclusion, amply supported by the evidence, certainly not against the manifest weight of the evidence. Would you not have, go ahead, finish. I was just going to say for the trial court to have read that as being perceived by my client as an actual lockout as of the date of October 2nd. And, in fact, Mr. Gatlin specifically testified he was worried for his own safety or that of his employees. He would not send them to the premises because he was afraid of Mr. Kumpel and what he might do. But without a five-day notice in writing, any attempt by the landlord would have been a trespass and your client would have had a cause of action, would he not? I agree. We could have pursued other legal remedies. We just chose to accept their offer. They said we're terminating the lease effectively. That's the way we reviewed that email. We want you out. They want us out for a long time. They basically, we, from their perspective, and this is not really the focus of the briefs, but it's in the statement. My point is it's not that the failure to file a five-day notice meant that there was, in fact, a co-ed cause of action. I'm suggesting that in order for this to actually result in some sort of imminent threat or danger to you or breach, there would have to have at least been something done, either a five-day notice and a lockout in violation of the rest of the lease or a lockout before the five-day notice in order to have a violation of the lease. I mean, I agree with you. I think that one of the trial court's findings is that there's a constructive eviction here. I think that is supported by the evidence because here it's not just a threat. In the Perry case, and the case is talking about mere words, they're talking about a threat of a lockout. And you could look, without taking the context of the party's relationship and everything that was adduced at trial about this plaintiff, I mean, you could look at the email on his face, it's just a threat of a lockout. In Perry, it was, you know, we're going to plug the locks. Well, plugging the locks isn't going to hurt anyone. But here, the email meant something entirely different. It meant that if you test my word, I might do something to you. The only evidence in the record, the only evidence in the record was that fact, that the ETX received that email. Are you talking about bodily injury or harm? Because where does that come from, that email, that a lockout results in, unless it's freezing cold out, and you don't have warm clothing on, and you don't have a means to leave the premises and get to warm shelter, how is this going to affect your client adversely? Because this is a plaintiff and the evidence established during trial that was a violent and threatening individual. And so testing that threat of a lockout, he said we're locking down the premises. And the way that that was received, and this is what the trial court concluded, was that ETX believed if it tried to access the premises, if it went to the premises, there may be, you know, who knows what he might do. He might have a baseball bat. He might have a crowbar. They felt that there would be a physical risk of harm. What instances was the, what instances are you aware of that the landlord was violent? My understanding was it was his spouse. They both engaged in threatening behavior. It was primarily the evidence focused on communications from Deanna Kumpel. She specifically threatened an ETX employee to her face by saying, you know, be careful riding your motorcycle home at night. We know where you live. There was, and I can't, I'm not going to quote from the e-mails, but there were e-mails sent that had, you know, outrageous, violent language threatening suppliers where they intentionally copied Mr. Gatlin on the e-mail to threaten him. Now, this is a disputed issue in the Vice Senator's report, but our view is that Ms. Kumpel actually admitted that that was her intent, that she had copied Mr. Gatlin on those e-mails in order to threaten and scare him. Were they admitted, those e-mails? The e-mails are admitted. The characterization of her intent is a disputed issue, but I think you could look just at the face of the e-mails. I mean, it's obvious why she copied Mr. Gatlin given the nature of the e-mails. You mentioned a few minutes ago that your client merely took up Mr. Kumpel on his offer. Is that how you view this, that there was an offer and then an acceptance on the part of your client? I really do. I mean, I think there's twofold. I think there is a constructive eviction as a factual matter, and I do think that this is a voluntary surrender, which is really just an offer and acceptance of a termination of the lease, and I think the Perry case recognized that. Chief Justice referenced the Perry case, and I'm paraphrasing, but, you know, where the landlord tells the tenant to leave and the tenant replies that it's all right and removes his possessions, there's a voluntary surrender, and that terminates the rent obligations, and that's what happened here. You know, the evidence is undisputed, and he even admitted this in his oral argument, that we were continuing to abide by our rent obligations. We had plans for the property. I remember Mr. Gatlin testifying as to, you know, other operations that they could shift into the building potentially or subletting the property. We were going to continue doing that. If you never send this e-mail, this never happens. This case never occurs. We never stop. You know, we would have paid the October rent. That's the only evidence in the records that we intended to pay it. Mr. Gatlin said that. And we would have continued on our merry way trying to find alternative uses for the property. But that's not what happened. He sent this e-mail, a threatening e-mail, and that's a factual matter. I mean, it was viewed, the only evidence in the record was that this was viewed as a threatening e-mail, that we were unwilling to test his word and go to the premises and try to access the premises because we were fearful for our safety. And, you know, on the constructive eviction point, you know, I'm not aware of any case in Illinois that talks about, you know, the threats are threats of lockout. I'm not aware of any case where it says that if the landlord says to the tenant, if you access the property, I'm going to shoot you. I'm going to cause you harm. And the tenant is required to challenge that in order to have a constructive eviction. I mean, if you look at the definition of constructive eviction, it's defined as something of a grave and permanent character with the intent of depriving the tenant of enjoyment on the premises. A threat of physical harm, I can't think of anything more grave and severe than that. And this, you know, there is no way. Does that mean that if we determine that the e-mail doesn't threaten bodily harm, that the court's judgment should be reversed because you're arguing that this was a constructive eviction because of threats of physical violence as opposed to voluntary relinquishment or termination of the lease? Now, are you going to argue both points? Are you going to argue alternative points? Or are you going to just argue that this was violence from the get-go and, therefore, there's a factual basis to support the constructive eviction based upon the fact that, you know, either he lied or people were going to die? I'm arguing both arguments, and I think the trial court recognized both. I mean, expressly, he found that our affirmative defenses of constructive eviction were founded, and I don't think you can reverse just based on the e-mail's interpretation because there's a whole body of evidence that the trial court relied on during the nearly one-week bench trial regarding the violent acts, the threats, the prior dealings of the parties, and that colors the language of that e-mail. So it's not – this isn't a question where you can just look at the face of the document. It's a question where you have to weigh and evaluate the credibility and the testimony of the witnesses. I mean, even the demeanor of the plaintiff when he was in the courtroom and not testifying, I think, came into the factor here. So the trial court found it reasonable for your client to not continue to occupy the present premises based upon the history of these individuals? Exactly. I think the trial court concluded that the e-mail coupled with the behavior of plaintiffs was a constructive eviction because it did oust us of possession. We were unable to, without a severe risk, a reasonable risk of bodily injury, to test that e-mail and go to the premises. It's a manifest way standard not to overreview. Exactly. It's a manifest way standard. Did the plaintiff have a duty to respond to your letter? I think it had a duty to either respond to the letter or not accept possession. I mean, they said – he argued that we tricked him or we took advantage of this e-mail, but it's really just the opposite. We would have continued paying the rent. He sends us this threatening lockout e-mail. We send a very reasonable letter a few days later saying, okay, here's how we understand your intention. We understand you to be terminating the lease. We understand you to want possession back, and therefore we're not going to pay you rent. He never changed that. He never said, no, no, I don't agree with that. Instead, he accepted possession. He took the keys back. He took the property back. I mean, what are we supposed to do? Sounds like an estoppel argument to me. Well, I think it could be supported in an estoppel argument. I think that would be an alternative ground that would be supported by the record. But I think really it's a classic case of voluntary surrender. There's no evidence suggesting that this chain of events didn't happen, that he didn't send the e-mail, that we didn't send the communication back saying, we understand you're terminating the lease, and that he accepted possession. If I understand your argument, what he should have done was he should have given you back the keys and had the locks changed. Well, I think what he should have done is said, no, I don't, I'm not terminating the lease. I expect you to pay the rent, and he didn't say that. And if he would have said that, we would have paid the rent, and we would have kept possession, and we would have looked at all those other alternatives that admittedly we were searching for. But, you know, he can't have it both ways. He can't threaten us and take possession and not allow us to access the property and then still try to collect rent. And there was evidence that he was using the property. I mean, once he, it's not like the building was vacant. He used the property. He eventually moved his own competing business into the property, which is probably his plan all along. But even during the intervening year, he was using it for storage for himself and friends, for, you know, vehicles and motorcycles and things of that nature. So, you know, he has to make his choice and live with it. His choice was to terminate the lease announced to us. And on this sort of, you know, mere words are not enough physical violence issue, you know, I'm not aware of Illinois case law that deals with that. But I did find, and this is not cited in our briefs, but I found an old California Court of Appeals case that talks about this point. And I really think this is, you know, I'll read from it, and I have extra copies, but I think it just recognizes common sense. And here's what the California, oh, may I quote quickly? Thank you, Your Honor. And here's what the California Court of Appeals said. A tenant is not obligated, nor is he encouraged by the law, to wage a deadly conflict to obtain entry to the demise premises. And where a tenant is denied entry and the denial is coupled with threats of violence upon entry, which threats are sufficient to cause a reasonable man to anticipate fear and bodily conflict or injury, the tenant is justified entry and the denial is an eviction. And interestingly, in that case, the facts were the landlord said, I'm going to lock the gates. There's no evidence whether the gates were in fact locked or not. He said, I'm going to lock the gates and you're never going to be allowed on that land while I'm still alive. And the California Court of Appeals said that that was an ominous statement akin to over my dead body. And so it was reasonable for the tenant to view that the attempt to access property would be met with physical violence. And that's a constructive eviction. And based on the body of the testimony and evidence during the one-week bench trial, I think the trial court was, the evidence and the support of the trial court's conclusion of constructive eviction, and it certainly was not against the manifest weight of evidence. Thank you, Your Honors. No. What's the site of the case? I apologize. It's, and I have extra copies as well. It's Donahue, D-O-N-O-G-H-U-E versus Kremel, K-R-E-M-M-E-L. It's 8 Pacific 2nd, 918, and it's from the California Court of Appeals. It's an old case. It's from 1932. Do you have a copy for counsel? I do. I think you're standing on your brief on the cross appeal. We are. We are. I can briefly touch those points, but we feel they're well briefed. Thank you. Thank you, Your Honors. Prosecutor Argulich. I'd probably like to address three basic points. The contention that the e-mail was an offer to leave, I think, turns the term offer on its head. A statement that we will be locking the building down with no invitation of any type to accept that as an offer is just not an offer. The violent or threatening conduct that somehow intimidated Mr. Gatlin and the ETX folks from returning to the premises all occurred in early 2007. Until October 2nd, 2009, those employees were very content and satisfied to be working at those premises and operating out of those premises with no concerns. The fact that an e-mail sent with the language it was sent, that it contained on October 2nd with no threat of physical violence of any type, did not imply any physical threat or any other type of conduct that would be in any way unsafe for anybody to return. The e-mails that were referred to were all those in 2007 also or were some continuing on later? The only evidence of any type of improper conduct and confrontation occurred in the very first months of the lease term that began on September 1 of 2007, and I believe it continued for approximately two months intermittently. So you're saying no e-mails after that? No e-mails of the type that threatened offensive conduct or threatening conduct towards ETX employees occurred after that, and again, that's consistent with Judge Hall's finding. I think it's at page 22, paragraph 7 of the report of proceedings that the parties performed their obligations under the lease without any kind of qualification or exception prior to October 2. The last point, I guess, is that there was no threat to change the locks. There was no threat to in any way bar access to the premises. The Perry decision is quite clear. Where the landlord tells the tenant to leave and the tenant replies that it's all right and removes its possession, there is no eviction but only a voluntary surrender. In no way, shape, or form did Mr. Kumpel or the landlord in any other fashion tell them to leave. He simply said, if you don't pay your rent, we will at some unspecified time be locking you out. That does not satisfy the standard as articulated in Perry, unless the Court has any further questions. I get back to what happened after that e-mail, and I think your argument is certainly quite reasonable as it relates to the e-mail itself. Just this e-mail that's sent and nothing ever happens, and that's not an offer to leave, at least arguably. But what happens after that is that your client receives notification that the person receiving this has taken it as an offer to leave, as a termination of the lease, and your client never responds. My client did respond by filing a lawsuit within a couple of weeks in which he said, A, we're suing to evict you because at this point we don't acknowledge that you have abandoned the premises, and number two, we are suing you for damages. So that lawsuit filed less than 30 days after the e-mail was sent basically asserted my client's rights and its interests in no uncertain terms, in the best way possible, by seeking court adjudication of the respective rights and obligations of the parties. That's, we would contend, is exactly the kind of response that is appropriate, and that's the kind of response that indicated its positions and indicated that it was not about to walk away from that lease and treat it as a no harm, no foul situation. I'd like to thank the attorneys for their arguments today. The case will be taken under advisement. I'll make sure to use this.